James R. Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Telephone: (562) 391-2487
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

Robert S. Green (State Bar No. 136183)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILL PATT, D.V.M., and LITTLE CRITTERS VET, LLC, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>ANTECH DIAGNOSTICS, INC.<br><br>        Defendant. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR RESTITUTION, INJUNCTION AND DAMAGES [PROPOSED CLASS ACTION] VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 AND BREACH OF CONTRACT – IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRAIL** |

00108582.000.docx

Plaintiffs Jill Patt, D.V.M., and Little Critters Vet, LLC, on behalf of themselves and all others similarly situated, allege the following:

## I.    PARTIES

### A.    Individual and Representative Plaintiffs

1.    Dr. Jill Patt, D.V.M. is a veterinarian, practicing through the auspices of Plaintiff Little Critters Vet, LLC, in Gilbert, Arizona.

2.    Little Critters Vet, LLC, is a limited liability company formed under Arizona law that operates a veterinary office and practice under the tradename Little Critters Veterinary Hospital in Gilbert, Arizona.

### B.    Antech

3.    Antech Diagnostics, Inc. ("Antech") is a California corporation with its corporate headquarters located at 17620 Mt. Hermann Street, Fountain Valley, California 92708.  It s a subsidiary of VCA, Inc., sometimes operating under the tradename VCA Antech, which began as an owner and operator of veterinary hospitals, but which now also holds subsidiaries operating in a number of pet health sectors.  On January 9, 2017, Mars, Inc. announced that it was purchasing VCA, Inc. for approximately $9.1 billion and, on September 12, 2017, announced that the acquisition had been completed.

## II.    JURISDICTION AND VENUE

4.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the members of the putative Class exceed $5 million, exclusive of costs, and each Plaintiff is a citizen of a different state than Defendant.

5.    The Central District of California has personal jurisdiction over Antech because it is authorized or registered to do business and operate in this District where it employed, and continues to employ, the sale tactics detailed in this Complaint.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Antech's headquarters are in this District and it transacts substantial business within this District.  Antech's form contracts for selling veterinary diagnostic laboratory test results include a venue provision providing, "Each of the parties hereto hereby irrevocably consents and submits to the exclusive personal jurisdiction of United States District Court for the Central District of California.

## III.    SUBSTANTIVE ALLEGATIONS

### A.    Antech Falsely Represents that it Provides Accurate Lab Results

7.      Historically, lab results provided to veterinarians have been highly accurate.  In most cases, there is an objective, scientific answer that can be determined consistently with precision.  Most veterinarians, when presented with the question of which lab to choose, do not anticipate that there will be significant variance in the quality of the lab results because that has not been the case historically.

8.      Antech represents that its lab results are of high quality and can be trusted because, among other things, it claims to employ high quality staff.  One such online representation is: "No one better understands the importance of quality patient care and the value of accurate, dependable diagnostic testing than VCA ANTECH.  …  Dependable testing is more than technology; accurate and dependable results rely on highly skilled and trained technicians. Each and every ANTECH Laboratory Technician is under daily QA/QC programs designed to ensure accurate results while receiving annual mandatory testing to insure their skills and knowledge are second to none." (http://www.antechdiagnostics.com/main/becomeanantechclient.aspx).  Dr. Patt saw and relied on this representation and other Antech representation of Antech's

quality results prior to entering into an agreement with Antech. This representation was intended to and did create the false impression that Antech manages its laboratory technician staff in such a way as to insure accurate and dependable test results. This impression is false for the reasons described below.

9.     Antech produces a steady stream of statements to veterinarians touting quality, such as the line on the front page of its 2015 fee schedule declaring that Antech is, "Defining the Standard of Excellence" at its diagnostic labs.

10.     Antech does not disclose and actively conceals the high level of incorrect lab results that it generates, as well as the complaints it regularly receives from veterinarians like Dr. Patt advising Antech that it provided false lab results and reports. Dr. Patt would not have entered into an agreement for the provision of lab testing and results with Antech if she had known that it provides false lab results.

**B.    Antech's Onerous Exclusive Contracts**

11.     Antech requires veterinarians to whom it provides what it contends are preferred pricing and priority customer service for its laboratory testing to sign a form contract it calls the "Exclusive Laboratory Services Agreement" (the "Exclusive Agreement). The Agreement signed by Dr. Patt on July 6, 2017 is not attached to this Complaint because it includes a confidentiality provision purporting to prohibit veterinarians from disclosing any terms of the agreement and declaring that a breach of any of the promises in the agreement will result in irreparable and continuing damage to Antech Diagnostics for which there shall be no adequate remedy at law. Notwithstanding this confidentiality provision, Antech routinely files the form agreement, including pricing, as an exhibit to complaints it files in federal courts around the country against veterinarians it deems to have violated the agreement. For example, Antech filed the entire

CLASS ACTION COMPLAINT

agreement in this District on December 11, 2015 in the case of *Antech Diagnostics v. Stamford Vet Center and Marcus Suppo,* Case No. 15-cv-9577DMC-E.  A copy of that iteration of Antech's form agreement is attached hereto as Exhibit A.

12.    Antech's confidentiality provisions prohibit veterinarians from disclosing any terms of the agreement or any pricing information related to the laboratory services provided under the agreement.  This strict confidentiality clause, particularly when combined with the "loan" and other purported discounts contained in the agreement, discussed below, create a conflict of interest between veterinarians and their clients because, under California rules, veterinarians are required to disclose the actual price charged by the laboratory for results.

13.    The confidentiality provisions in Antech's Exclusive Agreement, in conjunction with other provisions and practices discussed below, were designed to and have the effect of inhibiting and prohibiting veterinarians from discussing amongst themselves their relations with Antech.  As a consequence, the ability of veterinarians to mitigate the impact of Antech's onerous practices by ameliorating conduct has been impaired.

14.    Another factor making it difficult for veterinarians to communicate about, or even discern, Antech's conduct is the way in which Antech structures its statements to veterinarians so that the veterinarian has no means of knowing if Antech is honoring the preferred pricing specified in the Exclusive Agreement. Specifically, Antech simply provides a lump sum discount at the bottom of its statements with no information about what was actually charged to the veterinary practice per each individual test.

15.    Antech's Exclusive Agreement has an initial term of 6 years, requiring that veterinarians use Antech for almost their entire laboratory testing requirements during the term of the Exclusive Agreement.  The Exclusive Agreement states, "During the Term, Practice Owner shall cause all Laboratory

Services that are to be performed for and on behalf of the Practice(s), to be performed by a veterinary diagnostic laboratory owned or operated by Antech Diagnostics."  There are certain limited exceptions to the exclusivity provision, such as for tests that Antech does not perform, or where the test prices are less than 10% of all fees for such services.

16.     Antech's Exclusive Agreement also sets a minimum dollar amount per year that each practice must pay Antech.  For Dr. Patt, the agreement provided for purchase, after application of all discounts and credits, veterinary diagnostic laboratory services from Antech in "an aggregate amount of not less than $24,000" for each 12 month period following the July 1, 2017 Effective Date of the contract.   These annual minimum requirements, a standard feature of Antech's Exclusive Agreement, affect the incentives Antech will pay. Specifically, Antech salesmen endeavor to get veterinarians to agree to higher annual minimum limits in order to obtain greater incentive payments.

17.     Antech's form Exclusive Agreement also provides for a loan to the practice owner for a period equal to the exclusive term.  For Dr. Patt, the agreement provided a loan in the amount of $12,000 for a period of 6 years at an annual interest rate of 7%.  The "loan" is actually an element of the pricing and a mechanism to further incentivize practice owners to comply with the exclusivity requirements.  Thus, the loan includes a "forgiveness" provision that forgives each year's annual loan payment when the practice owner complies with its minimum dollar amount of purchases from Antech, as required under the Exclusive Agreement.

18.     Section 2 of the Exclusive Agreement states, "All Laboratory Services provided by Antech Diagnostics pursuant to this Agreement are provided in accordance with and subject to all terms and conditions set forth in the ANTECH Service Directory in effect at the time the Laboratory Services are performed." The Antech Service Directory states, "In accepting work, we warrant

that we shall provide services in a professional manner by qualified personnel, and we warrant the accuracy of the test results for the specimen submitted."

## C.     Antech's Provision of False Lab Results

19.     False lab reports place the veterinarians, their employees, and their patients at significant risk.  False lab reports also place a veterinarian's practice license at risk with their state board licensing agency.  Further, if the false lab results cause complications for the pet, the veterinarian could be liable.

20.     In December 2017, Dr. Patt began to have concerns over the quality of Antech's lab results.  At that point, she had received results from Antech on fecal samples that came back negative and, when questioned, were changed by Antech to positive.  Suspicious of the results she was receiving and concerned about the potential impact on her practice resulting from incorrect diagnoses resulting from false lab results, Dr. Patt began watching more closely for errors in the results and found several. These errors included blood serology for disease testing (both false positives and false negatives), as well as blood chemistry results, urinalysis and fecal results.   Her assistant began contacting the lab about the errors in the lab results, but received back mere excuses or no response at all.

21.     On December 27, 2017, Dr. Patt sent an email to her Antech representative to follow up on her assistant's communications.  In the email, Dr. Patt stated her concerns about the false lab results and identified several specific problems including:

     (a) Antech's failure to provide normal reference ranges, even when Dr. Pratt labeled the breed and species consistent with Antech's requirements;[1]

---

[1] Exotic pet normal reference ranges for testing should be based on a previously established bell curve.  Dr. Patt later discovered that Antech has failed to comport with standard accepted laboratory protocols by failing to establish normal reference ranges for exotic pets specific to their labs and equipment.

CLASS ACTION COMPLAINT

(b) Antech's failure to provide any results, falsely claiming the sample was not large enough in the case of Charlie Steel, a bird that died before Dr. Patt could obtain another sample;

(c) Antech's false negative on a fecal sample of Pocket, a rescue pet, that was changed to positive;

(d) Antech's false negative on a fecal sample of Rigby, that was also changed to positive; and

(e) Antech's picking up lab samples prior to the scheduled time, resulting in their not being received by Antech in a timely manner because they were not prepared for pickup at the earlier, unscheduled time.

22.    Over the next five to six months, Dr. Patt documented several false lab results that Antech reported and continued to charge her for, notwithstanding the errors.  These false reports include:

(a) Bella, a clinically healthy normal cockatoo with high uric acid and elevated liver values, for which Antech could not rerun sample because it was discarded due to time frame;

(b) Tank, a tortoise, who Antech falsely reported to have fecal results confirmed as positive for hookworms and corrected upon request for review;

(c) Butters, a dog, who Antech provided an incorrect coccidioidomycosis  (Valley Fever test) positive result later corrected to negative;

(d) Dexter, a dog for whom Antech provided an incorrect positive result for Ehrlichia Canis (tick fever test), a potentially life threatening disease;

(e) Phoebe, for whom Antech provided suspiciously low white blood counts;

CLASS ACTION COMPLAINT

(f) Kevin, a bearded dragon with diarrhea, for whom Antech incorrectly reported the results as negative, but later said that the tech noted that specimen leaked, and then updated the results to positive for coccidia;

(g) Many more documented false lab results.

23.    Suspicious of results she was receiving, Dr. Patt would request that Antech verify the results.  Several times she then received a corrected report days later with no contact from Antech or explanation of the failure, unless Dr. Patt pursued the matter further. In several instances, Antech reported the verification of the results incorrectly and had to later correct these when they were questioned.

24.    Documenting false lab results is a difficult endeavor that requires the veterinarian and her staff to do far more work than would otherwise be the case. Often the samples are destroyed during the testing process.  There are not easy methods to get second opinions on the lab tests in question.  In some cases, Dr. Patt was able to get Antech to review the tests to provide the correct results, but only because she spent the additional time and effort to follow up with Antech. And this additional time expended delayed her ability to report results to pet owners and in some cases delayed or precluded the correct treatment.  The provision of false positives causes the veterinarian to research the causes and treatments of diseases that the pet does not actually have.  The knowledge that test results are untrustworthy causes the veterinarians and their staffs to question all of the lab results and to spend much more time reviewing every detail in an attempt to not miss a false report from Antech that would cause a patient to suffer.

25.    A greater problem lies in those lab results that were not further examined at this level of detail, for there will be many instances of false lab results that go unnoticed because veterinarians need to and do trust the results they receive. Once Dr. Patt knew about the false lab results she had documented, she knew that she had unknowingly used other false lab reports in her practice

CLASS ACTION COMPLAINT

00108582.000.docx

1    and was no longer able to trust any results from Antech.  In particular, as a result

2    of Antech's faulty lab reports, Dr. Patt  had to be concerned that she would have

3    to address ill patients months or years later (especially for tick fever or valley

4    fever) whose test results were falsely reported by Antech as negative.  These

5    circumstances result in Dr. Patt having to expend additional time and money in

6    providing veterinary care, as well as causing stress to the practice and worries

7    about licensing.

8        26.    Dr. Patt sent dozens of communications to Antech regarding the false

9    lab results and requesting changes to her contract, which at that point, purported

10   to require her to continue using Antech exclusively for her lab tests for another 5

11   to 5 ½ years.  On the requests to change the contract, she received no response.

12       27.    Dr. Patt posted her concerns about Antech's false lab reports on an

13   online forum for veterinarians, to which other veterinarians around the country

14   responded with numerous additional examples of Antech providing false lab

15   results.  Other veterinarians included among their reports of false Antech lab

16   results, the following:

17           (a) Falsely reporting sensitivities to antibiotics that violate FARAD

18               with regard to chicken cultures;

19           (b) Lost two histopathology samples where the vet had sent the entire

20               masses, so there was no way to go back for more tissue;

21           (c) Incorrect reports sent on two cases where the vet contacted the pet

22               owners with the results only to have Antech send "corrected" results

23               later, which required the vet to call the owners to tell them that he

24               had provided them with incorrect lab results;

25           (d) UAs sent out for analysis did not come close to what vet saw in

26               house; samples loaded with bacteria, WBC, even sperm, and Antech

27               saw "no cells and no bacteria;"

28           (e)  Found their T4 levels on cats were very unreliable when a cat came

CLASS ACTION COMPLAINT

back normal and when rechecked two weeks later (after he continued to lose weight and vomit), he was severely hyperthyroid; checked the other T4 results that had been relied on and found two others that were hyperthyroid;

(f) Wrong sample used for a black lab with a large, black mass on its toe; the results from Antech reported malignant melanoma, so the entire toe was amputated and sent to Antech and the histopathology report came back squamous cell carcinoma; when asked why the results did not include the melanoma or the decalcified toe bone, the tech reported that they were not present in the sample, demonstrating that Antech provided results from the wrong sample;

(g) After Antech bought one local lab and merged it into Antech, a veterinarian sent a UA to get an ID on a Crystal seen in urine; on a fresh sample, there were at lease 30 crystals per HPF; Antech's results were completely off-base, showing no crystals, the pH, SP GRAV and the blood were all completely different than the urine sent in; spoke with the person in charge and learned that the person handling the urine samples was running behind, so he would run about every tenth one, and then (slightly) adjust those results and report them for the other nine.

28.    Antech monitors the online forum on which veterinarians post their comments and concerns. In one case, Antech convinced a member of the forum to share the discussion or their login with Antech, which then reviewed Dr. Patt's post. This conduct was in violation of the rules of the forum, such that the owner of the forum removed the person from membership in the forum and advised Antech that if it continued in its conduct, all veterinarians associated with Antech or VCA, Inc. would be also removed. Additionally, Antech has threatened to sue one anonymous poster on the forum and in another case changed its negotiation

00108582.000.docx

tactics against a veterinarian who advised forum readers that the Antech contracts contain a buried clause that requires notice one year in advance of terminating a contract, even where the contract appears to be for a set term.

29.    Antech's faulty laboratory practices threaten not only the health of animals, but of humans.   For example, Antech has provided false negative fecal results for hookworms in veterinary patients, such as in the instance of an animal named Petal Patt.  Hookworms are a zoonotic disease infecting humans, and specifically children.  Consequently, false negative results for this condition increase the likelihood that human children will contract hookworm from their pets.

30.    As another example, Antech has provided false negative results for Giardia in veterinary patients, such as in the instance of an animal named Honey Fricano.  Giardia is a zoonatic disease that humans can contract from dogs, which will increase the risk that the human will contract infections.  Consequently, false negative results for this condition increases the likelihood that human will contract Giardia.

31.    By providing invalid results to veterinarians across the country, Antech is also, in effect, proving invalid results to pet owners.  As a result, pet owners lost pets needlessly and had to experience their pets suffering prolonged treatment, with concomitant psychic and economic costs resulting from Antech's poor quality laboratory practices.

**D.    Antech's False Lab Reports Are a Foreseen Consequence of Its Practice of Excessively Reducing Labor Costs**

32.    When Dr. Patt has been able to get an explanation from Antech as to why lab results were faulty, the most common explanation is that the lab technician read the results incorrectly.  This is not surprising given that Antech's

/////

lab technician positions are lowly paid, often working at night, and poorly managed.

33.     Antech lab technicians made the following comments about their employment on the website Glassdoor.com:

      (a) Poor hourly wage and no work/life balance.

      (b) Over worked under paid better off working at Walmart.

      (c) Worst place I have ever worked in my life.

      (d) There is a high turnover rate.  I attribute this to a low pay and unrewarding work environment.

      (e) Under minimum wage cause of zoning loophole, not worth working here the pay is terrible for the amount of work expected from you. Especially for an overnight position and quota based job performance.

      (f) You make a dollar more than minimum wage that it.

34.     Antech lab technicians made the following comments about their positions on the website Indeed.com:

      (a) This is a terrible place to work.  No work-life balance, terrible management/HR, low pay, and overall abusive work culture.

      (b) Pay was less than I hoped for after two raises and promotions.  I ultimately decided to move on with my career in search of greater challenges and better pay.

      (c) Poorly trained management and expected to know everything without proper training beforehand and you never get out on time. OT is an expectation instead of an option.

35.     In short, Antech has engaged in a variety of conduct designed to cut its labor costs as low as possible, below the level that would allow it to provide the level of professionalism and accuracy it promises in the Exclusive Agreement and Antech marketing materials.

CLASS ACTION COMPLAINT

**E.    Antech Coerces Veterinarians to Remain in Contractual Relations**

36.    Antech uses force, coercion, threats, intimidation and federal lawsuits to keep its veterinarian clients in line paying their annual minimums and exclusively using Antech's services.  Antech has filed over 55 federal lawsuits against its veterinarian clients since February 2013.

37.    Prior to filing suit, Antech sends a threatening demand letter from its counsel to the veterinarians demanding huge sums of money not justified under the Exclusive Agreement and declaring that they win these cases when they are filed.  The letter sent to Dr. Patt, dated August 15, 2018, is attached as Exhibit B, without the attached copy of the Exclusive Agreement.

38.    In its letter to Dr. Patt, Antech demanded payment, as follows:  "You owe $298,704.76 which represents the amount that Antech has been damaged by your breach, including the return of the $24,000 incentive.  Accordingly, I will expect that a check made payable to 'Angech Diagnostics' in the amount of $1298,704.76 [sic] be delivered to my office no later than the close of business on August 24, 2018."  The letter does not explain or itemize how Antech determined that it was entitled to almost $300,000 or how it could be reasonable to require a veterinarian to pay that amount of money nine days from the date the letter was drafted.  In most case, Antech simply calculates the amount that the veterinarian would have paid if they had exclusively used Antech for the rest of the term, thus claiming 100% of those payments as "lost profits," without regard to the fact that is not how lost profits are calculated.

39.    In one case Antech litigated in Maryland, it claimed damages of $273,000 over the remaining life of the contract.  The Court in a Memorandum Opinion stated that Antech's "chance of actually recovering that amount appears remote."

/////

40.     Antech's demand letters are drafted to maximize the *in terrorem* effect on the recipients in the hope that they will generate further payments to Antech and prevent the recipients from determining the valid defenses they may have.

41.     Antech also requires the use of nondisclosure agreements in its settled litigation to prevent the veterinarians from putting each other on notice about Antech's tactics and its continuous provision of false lab results.

42.     One veterinarian stated that they had been threatened with a slander suit from Antech upper management if they posted on the online forum with complaints similar to Dr. Patt's complaints.

43.     Antech threatened to sue another veterinarian with similar complaints and indicated that Antech would seek all of his records, including the posts on the forum.   Antech also sent an investigator to take photographs of the IDEXX box on his door as proof that he was not exclusively using Antech and took video of the IDEXX driver picking up the samples.  (IDEXX is Antech's principal competitor.)

44.     Antech also uses the economic threat of litigation, rather than the merits of prospective litigation, to coerce veterinarians into abiding by the Exclusive Agreement.  As a large company that has extensive experience suing under the Extensive Agreement, Antech knows that it can easily afford the costs of each case much more readily than can an individual or small practice veterinarian, who has no such experience.  Consequently, Antech expects that many veterinarians will back down rather than follow-through on their desire to end contractual relations with Antech, an expectation that has frequently come to pass.

45.     A factor increasing Antech's ability to use the economic threat of litigation, rather than the merits of prospective litigation, to coerce veterinarians into remaining in contractual relations with Antech is the governing law and

00108582.000.docx

venue provision in the Exclusive Agreement.  *See* Exhibit A, Page 5 ¶ 9 & Page 9 ¶ 12, stating that any disputes arising out of the arrangement will be governed by California law and subject to the venue of this Judicial District.  Antech requires veterinarians all over the country to sign agreements containing these clauses, increasing the degree to which Antech is more familiar with the litigation that would ensue than would be the veterinarians, especially those in other states whose attorneys are not licensed to practice in California.  As a consequence, both Antech and the veterinarians know that any resulting litigation will be relatively cheaper for Antech and more expensive for the veterinarians than if the Exclusive Agreement was governed by the law of the state in which the veterinarian operated and/or in which the Antech lab performing the tests were located.

46.     It has been documented in a number of sources that veterinarians tend to be a very law abiding group relative to other medical professionals and the population at large.   This fact makes Antech's practice of suing large numbers of veterinarians for breach of contract even more suspicious and indicative of misconduct on Antech's part.

## F.     Antech Has Market Power

47.     Antech describes itself on its website by stating, "ANTECH Diagnostics® services more than 19,000 animal hospitals throughout North America, operates more than 50 reference laboratories in the US and Canada, and receives up to 45,000 samples daily."

48.     Years ago, there were numerous veterinary lab diagnostic services. Over time, they have consolidated.  Much of the consolidation has resulted from Antech's purchase of competing services.  By 2015, there were only three primary competitors in the market for veterinary lab diagnostic services, IDEXX, Antech and Abaxis.  Antech purchased Abaxis, leaving only the two competitors on the national market.  Because the vast majority of veterinarians need to use an

-15-

CLASS ACTION COMPLAINT

outside diagnostic lab service, they have only two realistic options: Antech and IDEXX. But IDEXX has its own history of exclusive dealing and other practices designed to restrain effective choice by veterinarians, leaving veterinarians without the free and fair competition among diagnostic laboratories that would foster their ability to avoid the drawbacks of Antech's misconduct.

49.    Further, Mars, the parent company of Antech, owns more veterinary hospitals than any other entity in the United States. Mars requires such facilities to use Antech exclusively for diagnostic laboratory tests, further insulating Antech from the pressures of competition that would otherwise benefit veterinarians, their patients, and the pet owners who patronize them.

## CLASS ALLEGATIONS

50.    Plaintiffs bring this action on behalf of themselves and the members of the proposed Class under Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure. The proposed Class consists of the following:

> All veterinarians and/or their associated practice entities that are parties to an Exclusive Laboratory Services Agreement with Antech or have been such parties at any time since four years prior to the filing of this Complaint.

51.    Excluded from the Class are Antech, its parents, subsidiaries, affiliates, officers and directors, any entity in which Antech has a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

52.    Numerosity. Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder is impractical. The Class consists of around 4,000 members. The precise number is within Antech's knowledge and can be ascertained only by resort to Antech's records.

53.    Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are numerous questions of law and fact common to the Class that predominate over
/////

00108582.000.docx

any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Antech concealed the significant amount of false lab results that it was providing;

(b)    Whether Antech made false representations about the accuracy and dependability of its lab results;

(c)    Whether Antech has cut its labor costs to a level that makes it impossible for Antech to live up to its promises to provide accurate lab results and reports with the requisite level of professionalism;

(d)    Whether Antech took steps to make it more difficult for veterinarians to learn of Antech's practices, as alleged above;

(e)    Whether Antech used the economic threat of litigation, rather than the merits of litigation, to coerce veterinarians to remain in contractual relations with Antech;

(f)    Whether Antech has consciously increased its market power with the result that veterinarians no longer enjoy the benefits of free and fair competition among diagnostic laboratory vendors;

(g)    Whether Antech is placing public health at risk;

(h)    Whether Antech is violating the public trust;

(i)    Whether Class members are entitled to restitution, and in what amount;

(j)    Whether Antech violated its duty of good faith and fair dealing under the Exclusive Agreements; and

(k)    Whether Class Members are entitled to damages and a declaration of relief as a result of Antech's breach.

54.    <u>Typicality.</u>  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the members of the Class and, like all members of the Class,

-17-

00108582.000.docx

1  Plaintiffs entered into an Exclusive Agreement with Antech. Plaintiffs have no

2  interests antagonistic to the interests of any other member of the Class.

3      55.    Adequacy. Fed. R. Civ. P. 23(a)(4).  Plaintiffs are each a

4  representative who will fairly and adequately assert and protect the interests of the

5  Class and have retained counsel experienced in prosecuting class actions.

6  Accordingly, each Plaintiff is an adequate representative, who will fairly protect

7  the interests of the Class.

8      56.    Superiority of Class Action. Fed. R. Civ. P. 23(b)(3).  A class action

9  is superior to all other available methods for the fair and efficient adjudication of

10  this lawsuit, because individual litigation of the claims of all members of the

11  Class is economically unfeasible and procedurally impracticable. While the

12  aggregate damages sustained by the Class are in the millions of dollars, the

13  individual damages incurred by each member of the Class resulting from

14  Antech's wrongful conduct are relatively small to warrant the expense of

15  individual lawsuits – all the more so in light of likely reprisal by Antech in the

16  form of meritless counterclaims for breach of the Exclusive Agreement and the

17  confidentiality clauses therein. The likelihood of individual Class members

18  prosecuting their own separate claims is thus remote, and, even if every member

19  of the Class could afford individual litigation, the court system would be unduly

20  burdened by individual litigation of such cases.

21      57.    The prosecution of separate actions by members of the Class would

22  create a risk of establishing inconsistent rulings or incompatible standards of

23  conduct for Antech.  Additionally, individual actions may be dispositive of the

24  interests of the Class, although certain class members are not parties to such

25  actions.

26      58.    Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).  The

27  conduct of Antech is generally applicable to the Class as a whole and Plaintiffs

28  seek equitable remedies with respect to the Class as a whole.  Plaintiffs do not

-18-

CLASS ACTION COMPLAINT

1  seek monetary relief as an aspect of the Rule 23(b)(2) class.  As such, the

2  systematic policies and practices of Antech make declaratory or equitable relief

3  with respect to the Class as a whole appropriate.

4       59.    <u>Issue Certification</u>.  Fed. R. Civ. P. 23(c)(4).  In the alternative, the

5  common questions of law and fact, set forth above, predominate and are

6  appropriate for issue certification on behalf of the proposed Class.

7

8  

**<u>COUNT I</u>**
***Unfair Business Practices***
(California Business & Professions Code § 17200, *et seq.*
Unfair Competition Law ("UCL"))

9

10

11       60.    Plaintiffs incorporate and reallege by reference each and every

12  allegation above as if set forth herein in full.

13       61.    The UCL defines unfair business competition to include any

14  "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive,

15  untrue or misleading" advertising.  Cal. Bus. & Prof. Code §17200.

16       62.    The gravity of the harm to Class Members resulting from these

17  unfair acts and practices outweighs any conceivable reasons, justifications or

18  motives of Antech for engaging in such deceptive acts and practices.  By

19  committing the acts and practices alleged above, Antech engaged in unfair

20  business practices within the meaning of the UCL.

21       63.    Antech's conducts, as alleged above, were also offensive to

22  established public policy, immoral, unethical, oppressive, unscrupulous, and

23  substantially injurious to veterinarians and those who use their services.

24       64.    Through unfair acts and practices, Antech improperly obtained

25  money from Plaintiffs and other Class Members.  Accordingly, Plaintiffs request

26  that this Court cause Antech to restore this money to Plaintiffs and all Class

27  Members, and to enjoin Antech from continuing to violate the UCL as discussed

28

00108582.000.docx

1   herein and from violating the UCL in the future.  Otherwise, Plaintiffs, Class

2   Members, and members of the general public may be irreparably harmed or

3   denied an effective and complete remedy if such an order is not granted.

4       65.     Plaintiffs are entitled to an award of costs and attorneys' fees

5   pursuant to California Code of Civil Procedure, section 1021.5 and Civil Code,

6   section 1717.

7                           **COUNT II**
                    ***Fraudulent Business Practices***
8       (California Business & Professions Code § 17200, *et seq.*)

9       66.     Plaintiffs incorporate and reallege by reference each and every

10  allegation above as if fully set forth herein.

11      67.     A business act or practice is "fraudulent" under the UCL if it is likely

12  to deceive members of the consuming public.

13      68.     Antech's use of representations regarding the accuracy and

14  dependability of its lab results and its concealment of the significant amount of

15  false lab results that it reports to veterinarians is "fraudulent" within the meaning

16  of the UCL because it deceived Plaintiff, and was likely to deceive reasonable

17  Class Members, into believing that Antech was offering accurate and dependable

18  lab results.  This perception induced reasonable veterinarians, including Plaintiff,

19  to enter into Exclusive Agreements with Antech which they otherwise would not

20  have entered into.

21      69.     Plaintiffs objectively relied on Antech's misleading and deceptive

22  representations and omissions regarding the accuracy and dependability of its lab

23  results.  Plaintiffs suffered monetary loss as a result of Antech's fraudulent

24  practices described herein.

25      70.     Antech also took steps to prevent veterinarians from communicating

26  about their experiences with Antech, thus making it much more difficult for

27  veterinarians to know ahead of time the precise nature of the contractual relations

28

00108582.000.docx

1   that Antech would contend they were entering into, and Antech's policies and

2   practices designed to make it extremely difficult for veterinarians to extricate

3   themselves from Exclusive Agreements.

4      71.    Through these fraudulent acts and practices, Antech improperly

5   obtained money from Plaintiffs and the other Class Members.   Plaintiffs request

6   that this Court cause Antech to restore this money to Plaintiffs and all Class

7   Members, and to enjoin Antech from continuing to violate the UCL as discussed

8   herein or from violating the UCL in the future.  Otherwise, Plaintiffs, the

9   respective Class they seek to represent, and members of the general public may be

10  irreparably harmed or denied an effective and complete remedy if such an order is

11  not granted.

12     72.    Plaintiffs are entitled to an award of costs and attorneys' fees

13  pursuant to California Code of Civil Procedure, section 1021.5 and Civil Code,

14  section 1717.

**COUNT III**
*Unlawful Business Practices*
(California Business & Professions Code § 17200, *et seq.*)

18     73.    Plaintiffs incorporate and reallege by reference each and every

19  allegation above as if fully set forth herein.

20     74.    A business act or practice is "unlawful" under the UCL if it violates

21  any other law or regulation.

22     75.    Both federal law, 15 U.S.C. §§ 1, 2, 14, and California law, Business

23  and Professions Code § 16720, 16726, and 16726[2] prohibit exclusive dealing

24  contracts where such contracts tend to harm competition in a relevant market,

25  including where they "substantially lessen competition or tend to create a

26  monopoly."  Bus. & Prof. Code § 16727.

---

[2] The Exclusive Agreements specifically state that the governing state law is
California law.

00108582.000.docx

76.     As alleged above, Antech's Exclusive Agreements harm competition, substantially lessen completion, and tend to create a monopoly in the market where veterinarians are consumers: the market for veterinarian diagnostic laboratory tests, supplies, and results.  Antech has substantial market power in that market as one of two duopolists, along with IDEXX, who provide nearly all the off-site veterinary laboratory testing in the United States.  Antech has consciously increased that market power by the conduct alleged herein and by acquiring other veterinary laboratory testing businesses.

77.     By tying veterinarians to long-term Exclusive Agreements with the misconduct alleged above, Antech makes it more difficult for them to patronize another veterinary laboratory testing company.   In particular, veterinarians are locked into the Exclusive Agreement by:

(a)     Antech's practice of providing a "loan" at the outset of the agreement whose balance is due only if the Exclusive Agreement is terminated, or if minimum purchase levels are not met;

(b)     Antech's position that, if the veterinarian terminated the contract, Antech is entitled to all its expected revenue under the terms of the contract, which Antech falsely contends are lost profits;

(c)     Antech's confidentiality provisions, making it more difficult for veterinarians to learn about Antech's conduct, particularly before they sign the Exclusive Agreement;

(d)     Antech's practice of suing veterinarians who seek to terminate the Exclusive Agreement, not out of a good faith belief in the merits of the litigation, but in order to impose prohibitive litigation costs *in terrorem*;

78.     Through these illegal acts and practices, Antech obtained money from Plaintiffs and all other respective Class Members.  Plaintiffs request that this Court cause Antech to restore this money to Plaintiffs and the other Class

Members and to enjoin Antech from continuing to violate the UCL, or from violating the UCL in the future.  Otherwise, Plaintiffs, the Class, and members of the general public may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

79.    Plaintiffs are entitled to an award of costs and attorneys' fees pursuant to California Code of Civil Procedure, section 1021.5 and Civil Code, section 1717.

**COUNT IV**
**Breach of Contract based on the Duty of Good Faith and Fair Dealing**

80.    Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

81.    Plaintiffs and the Class entered into Exclusive Agreements with Antech.

82.    Plaintiffs performed all material terms required under the Exclusive Agreements.

83.    Plaintiffs demanded that Antech provide reliable veterinary diagnostic lab results.

84.    Antech materially breached its duty of good faith and fair dealing under the Exclusive Agreements for the reasons stated above.

85.    Plaintiffs and the Class are entitled to an award of damages, including for the costs of researching and verifying Antech's false laboratory test results,  and a declaration that they are not obligated to continue complying with the Exclusive and Annual Minimums required in the Exclusive Agreements – in particular, a declaration that Plaintiffs and the Class are not obliged to repay the value of the incentive payments or the "loan" included as part of the overall pricing scheme in the Exclusive Agreement.

86.    Plaintiffs are entitled to an award of costs and attorneys' fees pursuant to California Civil Code, section 1717.

CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand judgment against Antech as follows:

A.      An order certifying that this action may be maintained as a class action, that Plaintiffs be appointed Class Representatives and Plaintiffs' counsel be appointed Class Counsel;

B.      A judgment awarding Plaintiffs and all members of the Class for damages, restitution or other equitable relief, including, without limitation, disgorgement of all profits and unjust enrichment that Antech obtained from Plaintiffs and the Class as a result of the unlawful, unfair and fraudulent business practices described herein;

C.      An order enjoining Antech from continuing to violate the laws as described herein;

D.      A declaration that Plaintiffs and the Class are not required to continue compliance with the Exclusive and Annual Minimum provisions of their Exclusive Agreements with Antech – in particular, a declaration that Plaintiffs and the Class are not obliged to repay the value of the incentive payments or the "loan" included as part of the overall pricing scheme in the Exclusive Agreement.

E.      A judgment awarding Plaintiffs the costs of suit, including reasonable attorneys' fees, and pre and post-judgment interest; and

F.      Such other and further relief as may be deemed necessary or appropriate.

/////
/////
/////
/////
/////
/////

CLASS ACTION COMPLAINT

00108582.000.docx

1

## JURY DEMAND

2

Plaintiffs demand trial by jury on all claims so triable.

3

4

DATED:  September 19, 2018            **GREEN & NOBLIN, P.C.**

5

6

By:  _/s/ James Robert Noblin_

7

James Robert Noblin

8

4500 East Pacific Coast Highway

9

Fourth Floor

Long Beach, California 90804

10

Telephone: (562) 391-2487

11

Facsimile:  (415) 477-6710

Email:  gnecf@classcounsel.com

12

13

-and-

14

Robert S. Green

15

**GREEN & NOBLIN, P.C.**

2200 Larkspur Landing Circle, Suite 101

16

Larkspur, CA  94939

17

Telephone:  (415) 477-6700

Facsimile:  (415) 477-6710

18

Email:  gnecf@classcounsel.com

19

20

*Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

00108582.000.docx